2010-1051

# In the
# United States Court of Appeals
# for the Federal Circuit

———◗◖———

IRIS CORPORATION,

*Plaintiff-Appellant,*

v.

JAPAN AIRLINES CORPORATION,

*Defendant,*

and

JAPAN AIRLINES INTERNATIONAL COMPANY, LTD.,

*Defendant-Appellee,*

———◗◖———

Appeal from the United States District Court for the Eastern District of New York in Case No. 06-CV-6336, The Honorable Carol Bagley Amon.

## CORRECTED BRIEF OF DEFENDANT-APPELLEE JAPAN AIRLINES INTERNATIONAL COMPANY, LTD.

MEREDITH MARTIN ADDY
STEPTOE & JOHNSON LLP
115 S. LaSalle Street
Suite 3100
Chicago, IL 60603
312.577.1300

CHARLES F. SCHILL
  (*Counsel of Record*)
WILLIAM KARAS
CAROL GOSAIN
PAUL D. LALL
STEPHANIE L. ROBERTS
STEPTOE & JOHNSON LLP
1300 Connecticut Avenue, N.W.
Washington, DC 20036
202.429.6267

April 2, 2014

*Attorneys for Defendant-Appellee Japan Airlines International Company, Ltd.*

## United States Court Of Appeals For The Federal Circuit

*IRIS CORP. v. JAPAN AIRLINES*

*Case No. 2010-1051*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee, Japan Airlines International Company, Ltd. certifies the following:

1. The full name of every party or amicus represented by me is:

Japan Airlines Company, Ltd., *formerly known as* Japan Airlines International Company, Ltd.

2. The name of the real party in interest represented by me is:

Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

Not applicable.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

William Karas, Charles Schill, Meredith Martin Addy, Carol Gosain, Paul Lall, Stephanie Roberts, all of Steptoe & Johnson LLP

Dated: April 2, 2014

Respectfully submitted,

/s/ Meredith Martin Addy

| | |
|---|---|
| Meredith Martin Addy | Charles F. Schill |
| STEPTOE & JOHNSON LLP | William Karas |
| 115 South LaSalle Street | Carol Gosain |
| Suite 3100 | Paul D. Lall |
| Chicago, IL 60603 | Stephanie L. Roberts |
| 312.577.1300 | STEPTOE & JOHNSON LLP |
| | 1330 Connecticut Avenue, N.W. |
| | Washington, D.C. 20009 |
| | 202.429.3000 |

*Attorneys for Defendant-Appellee Japan Airlines International Company, Ltd.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ........................................................... 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

STATEMENT OF THE FACTS ................................................................. 4

I.  UNITED STATES LAW AND INTERNATIONAL LAW
    REQUIRE JAL TO ASSIST IN PROTECTING THE SAFETY
    AND SECURITY OF U.S. CITIZENS ............................................... 4

    A.  United States Law .................................................................. 5

    B.  International Law ................................................................... 8

II. THE LITIGATION ........................................................................... 9

SUMMARY OF ARGUMENT ................................................................. 12

STANDARD OF REVIEW ....................................................................... 15

ARGUMENT ........................................................................................... 16

I.  THE DISTRICT COURT CORRECTLY DISMISSED IRIS'
    CLAIM BECAUSE SECTION 1498(a) REQUIRES IRIS TO
    SEEK RECOVERY ONLY FROM THE UNITED STATES .......... 16

    A.  Where Federal Law Mandates A Specific Action, The
        United States Is The Only Proper Defendant ......................... 16

    B.  The *En Banc* Decision in *Zoltek V* Confirms Iris' Remedy
        Lies With The United States .................................................. 19

        1.  *Zoltek V* Broadened The Interpretation Of Section
            1498 To Cover Accusations Under Section 271(g) ....... 19

        2.  The District Court Properly Found That JAL
            Satisfied The Requirements For Exemption Under
            Section 1498 ........................................................... 22

II. THE DISTRICT COURT PROPERLY DETERMINED THAT
    IN THIS CASE NATIONAL SECURITY INTERESTS
    OUTWEIGH IRIS' PRIVATE, COMMERCIAL INTEREST ......... 24

A. The District Court Concluded That A Conflict Exists Between Two Statutes ............................................................. 24

    1. The Enhanced Border Security Act Mandates JAL Examine Passports ................................................. 24

    2. If Iris' Infringement Claim Has Merit, The Requirement To Examine Departing Passenger Passports Conflicts With 35 U.S.C. § 271(g) ................ 26

B. The District Court Properly Applied *SmithKline* To Dismiss The Complaint ............................................................. 29

    1. *SmithKline* Sets Forth The Conflict of Laws Analysis .......................................................................... 29

    2. Iris' Arguments Against *SmithKline* Logically Fail ...... 31

III. OTHER ARGUMENTS SUPPORT UPHOLDING THE DISTRICT COURT'S DISMISSAL ................................................. 34

A. JAL's Passport Examination Falls Outside The Scope Of Section 271(g) ........................................................................... 34

    1. A Passport Is Not A "Product" Under Section 271(g) ............................................................................ 34

    2. JAL's Examination Of A Passport Is Not A "Use" Under Section 271(g) ..................................................... 37

    3. If Applied To A Passport, "Product" And "Use" In 35 U.S.C. § 271(g) Should Not Be Interpreted To Undermine National Security ....................................... 42

B. The Doctrine Of Foreign Sovereign Compulsion Bars Iris' Claim ....................................................................................... 43

    1. Foreign Sovereign Compulsion Is A Complete Defense To Iris' Claim Of Patent Infringement ........... 43

    2. JAL Must Comply With Foreign Laws Requiring Examination Of Passports ........................................... 46

    3. These Foreign Laws Are Not Inconsistent With Controlling U.S. Laws ................................................. 49

CONCLUSION ............................................................................... 50

# TABLE OF AUTHORITIES

Page

Cases

*Airline Pilots Ass'n*, *Int'l. v. Quesada*,
748 F.2d 892 (2d Cir. 1960).................................................... 44

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
228 F.3d 1338 (Fed. Cir. 2000)............................................... 38

*Allegheny Ludlum Corp. v. Nippon Steel Corp.*,
765 F. Supp. 224 (E.D. Pa. 1991) ........................................... 37

*Anaheim Gardens v. United States*,
444 F.3d 1309 (Fed. Cir. 2006)............................................... 16

*Bayer AG v. Housey Pharm., Inc.*,
340 F.3d 1367 (Fed. Cir. 2003)....................................... passim

*Biodex Corp. v. Loredan Biomedical, Inc.*,
946 F.2d 850 (Fed. Cir. 1991)................................................ 16

*Cf. Tec Air, Inc. v. Nippondenso Mfg. U.S.A., Inc.*,
No. 91 C 4488, 1997 WL 49300 (N.D. Ill. Jan. 30, 1997)....................... 39

*Danisco U.S. Inc. v. Novozymes A/S*,
– F.3d –, 2014 WL 929348 (Fed. Cir. 2014)........................... 16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................ 30, 42

*Gen-Probe, Inc. v. Amoco Corp., Inc.*,
926 F. Supp. 948 (S.D. Cal. 1996) .......................................... 40

*Gregory v. Daly,* 243 F.3d 687 (2d Cir. 2001) ........................... 15

*Hughes Aircraft Co. v. United States*,
534 F.2d 889 (Ct. Cl. 1976) ................................................ 23

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*,
307 F. Supp. 1291 (D. Del. 1970) ....................................... 43, 45

*Mannington Mills, Inc. v. Congoleum Corp.*,
595 F.2d 1287 (3d Cir. 1979)................................................ 45

*McElderry v. Cathay Pacific Airways, Ltd.*,
678 F. Supp. 1071 (S.D.N.Y. 1988).......................................... 44, 45

*Monsanto Co. v. Syngenta Seeds, Inc.*,
   431 F. Supp. 2d 482 (D. Del. 2006) ........................................................ 41

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*,
   830 F.2d 449 (2d Cir. 1987) .................................................... 45

*Ohio Willow Wood Co. v. Alps South, LLC.*,
   735 F.3d 1333 (Fed. Cir. 2013) ................................................ 16

*Pfizer Inc. v. Aceto Corp.*,
   853 F. Supp. 104 (S.D.N.Y. 1994) ............................................ 37

*Ricart v. Pan Am. World Airways, Inc.*,
   No. Civ. A. 89-0768 (HHG), 1990 WL 236080
   (D.D.C. Dec. 21, 1990) ................................................................. 8

*Richmond Screw Anchor Co. v. United States*,
   275 U.S. 331 (1928) ........................................................................ 17

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson
   Pharm., Inc.*, 211 F.3d 21 (2d Cir. 2000) .................................... 29

*Societe Internationale v. Rogers*,
   357 U.S. 197 (1958) ........................................................................ 44

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   2004 WL 1872707 (S.D.N.Y. Aug. 19, 2004) .......................... 40

*United States v. Laub*,
   385 U.S. 475 (1967) ........................................................................ 35

*Worthy v. United States*,
   328 F.2d 386 (5th Cir. 1964) ........................................................ 35

*Zenith Elecs. Corp. v. Exzec, Inc.*,
   182 F.3d 1340 (Fed. Cir. 1999) .................................................... 30

*Zoltek Corp. v. United States*,
   442 F.3d 1345 (Fed. Cir. 2006) ....................................... 3, 12, 19

*Zoltek Corp. v. United States*,
   672 F.3d 1309 (Fed. Cir. 2012) ........................................... passim

<u>Statutes</u>

17 U.S.C. § 101 ..................................................................................... 32

19 U.S.C. § 1337 ....................................................................... 20, 35, 36

28 U.S.C. § 1498(a) ................................................................ passim

35 U.S.C. § 154(a) ................................................................ 20

35 U.S.C. § 271(a) ................................................................ 19

35 U.S.C. § 271(g) ................................................................ passim

8 U.S.C. § 1221 ................................................................ 2, 5, 6, 25

Other Authorities

1 *Restatement of the Law (Third) on the Foreign Relations of the*
*United States* § 441 (1987) ...................................................... 43

Brazilian Decree No. 3.720, Jan. 8, 2001,
D.O. Electronico de 09.01.2001 ............................................... 48

Brazilian Law No. 6.815, Aug. 19, 1980,
D.O.U. de 21.08.1980, P. 16534 ............................................. 48

Brazilian Law No. 7.565, Dec. 19, 1986,
D.O.U. de 23.12.1986, P. 19567 ............................................. 48

Convention on International Civil Aviation, Dec. 7, 1944,
61 Stat. 1180, TIAS 1591, 15 U.N.T.S. 295 ........................... 8

Don Wallace, Jr. & Joseph P. Griffin, *The Restatement and Foreign*
*Sovereign Compulsion: A Plea for Due Process*,
23 Int'l Law. 593, 594 (1989) ................................................. 44

*Electronic Transmission of Passenger & Crew Manifests for*
*Vessels & Aircraft*, 70 Fed. Reg. 17,820 (Apr. 7, 2005) ........... 6, 14

Enhanced Border Security and Visa Entry Reform Act of 2002,
Pub. L. No. 107-173, 116 Stat. 543 (2002). ........................... passim

H.R. Rep. No. 100-60 ................................................................ 36

Japanese Customs Act (Law No. 61, Apr. 2 1954) ...................... 47

Japanese Customs Act Enforcement Order
(Gov't Order No. 150 of 1954) ............................................... 48

Japanese Immigration Control and Refugee Recognition Law
(Gov't Order No. 319, Oct. 4, 1951), ch. 6, art. 56-2 ............... 47

S. Rep. No. 100-83, at 39 (1987) .............................................. 39

The Act of 1918, Pub. L. No. 65-150, 40 Stat. 553 (1918) ......... 17

Rules

19 C.F.R. § 122.49 ............................................................................. passim

19 C.F.R. § 122.75 ............................................................................. passim

22 C.F.R. § 51.7 .......................................................................... 14, 28, 35

8 C.F.R. § 231.1 .......................................................................... 7, 18, 25

8 C.F.R. § 231.2 .................................................................... 7, 18, 23, 25

Rule 12(b)(6), Federal Rules of Civil Procedure .................................. passim

Rule 44.1, Federal Rules of Civil Procedure ............................................. 47

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court. No other cases are known to counsel that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF THE ISSUES

1.    The district court correctly dismissed the action under Fed. R. Civ. P. 12(b)(6) because Iris' remedy for any alleged infringement of U.S. Patent No. 6,111,506, concerning a method for manufacturing an improved security identification document, lies exclusively against the United States under 28 U.S.C. § 1498(a).

2.    Alternatively, the district court properly dismissed under Fed. R. Civ. P. 12(b)(6) because, assuming *arguendo* that Iris' infringement claim has merit, the national security interests protected by the Enhanced Border Security Act outweigh Iris' private, commercial interest in its patent under 35 U.S.C. § 271(g).

3.    Alternatively, the district court correctly dismissed the action under Fed. R. Civ. P. 12(b)(6) because 35 U.S.C. § 271(g) does not encompass JAL's handling of government-owned, electronic passports and because the doctrine of foreign sovereign compulsion bars Iris' claims.

1

## <u>STATEMENT OF THE CASE</u>

At the district court, Appellant Iris Corporation ("Iris") alleged that

Appellee Japan Airlines Co., Ltd. ("JAL")[1] infringes U.S. Patent No.

6,111,506, entitled:  Method of Making an Improved Security Identification

Document Including Contactless Communication Insert Unit (the "'506

patent") under 35 U.S.C. § 271(g), by examining U.S. and foreign electronic

passports at U.S. airports during flight check-in.  A74-75 ¶¶ 18-21.  On

September 30, 2009, the district court granted JAL's motion to dismiss

holding that – assuming *arguendo* that Iris' infringement claim has merit –

the Enhanced Border Security and Visa Entry Reform Act of 2002

("Enhanced Border Security Act"), Pub. L. 107-173, 116 Stat. 543 (codified

in pertinent part at 8 U.S.C. § 1221), which requires JAL to inspect the

passports of passengers departing the United States, conflicts with 35 U.S.C.

§ 271(g).  The court held that the national security interests protected by the

Enhanced Border Security Act outweigh Iris' private, commercial interest in

its patent under Section 271(g).  A10.

---

[1] JAL's corporate name changed from Japan Airlines International

Co., Ltd. to Japan Airlines Co., Ltd. effective April 1, 2011.

At the time of the district court's decision (as is the case now), 28 U.S.C. § 1498(a) provided that when an invention covered by a U.S. patent is used by or for the United States, a patentee's exclusive remedy for infringement "shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a). However, that statute had been interpreted to apply only to 35 U.S.C. § 271(a), and not to § 271(g). *See Zoltek Corp. v. United States*, 442 F.3d 1345, 1370 (Fed. Cir. 2006) ("*Zoltek III*"), *vacated* 672 F.3d 1309 (Fed. Cir. 2012) (*en banc*).

Based on that interpretation, the district court determined that, even though JAL met the requirements under Section 1498(a) to be shielded from liability, because Iris asserted infringement under Section 271(g), it could not rule that Iris' exclusive remedy was with the United States. A13-14. The district court also held that JAL's examination of U.S. and foreign electronic passports could constitute infringement under 35 U.S.C. § 271(g), if all the limitations to the claims were met. The court found that a passport is a "product" and JAL's examination of a passport is a "use" under that statutory section. A6-8. The district court declined to address JAL's

3

assertion that the doctrine of foreign sovereign compulsion bars Iris' claim because foreign governments such as Japan and Brazil require JAL to examine passports on U.S. soil. A14.

On October 13, 2009, Iris filed a notice of appeal. A56. JAL subsequently filed for reorganization, causing the appeal to be stayed from February 5, 2010 through December 2013. *See* Dkt. Nos. 18, 42. While this case was stayed, the Court decided the *en banc* case *Zoltek Corp. v. United States* ("*Zoltek V*"), modifying its prior interpretation of Section 1498(a) to encompass acts of infringement under 35 U.S.C. § 271(g). *See* 672 F.3d 1309, 1325-26 (Fed. Cir. 2012) (*en banc*).

## STATEMENT OF THE FACTS

### I. UNITED STATES LAW AND INTERNATIONAL LAW REQUIRE JAL TO ASSIST IN PROTECTING THE SAFETY AND SECURITY OF U.S. CITIZENS

Since the early days of commercial aviation, airlines have been obligated by the laws of their homelands, the laws of other nations, and international law to ensure that passengers are carrying proper documentation for their overseas travel. This obligation is founded on national security and border control concerns, as well as internationally-agreed notions of sovereign rights. As acts of terrorism have become more

4

prevalent, and particularly after the tragic events of September 11, 2001, nations have increasingly relied on airlines to serve as the front line in protecting the security and safety of their citizens.

### A. United States Law

In the United States, airlines perform this duty at the direction of the U.S. Government, by examining passenger travel documents, transmitting passenger information collected from such travel documents to customs, immigration and transportation security authorities, and comparing such information to no-fly and similar lists, thereby preventing high-risk passengers from boarding international flights.[2]

Legislation enacted by Congress in the wake of "9/11" compels JAL to examine the passports of passengers departing the United States. Specifically, Section 402 of the Enhanced Border Security Act amended Section 231 of the Immigration and Nationality Act, 8 U.S.C. § 1221, to require airlines to provide U.S. border officials with certain passenger and

---

[2] The recent disappearance of Malaysian flight 370, and the stolen passport issues that came to light during the investigation of that incident, underscore the critical importance of the passport examination duty performed by airlines on behalf of governments.

crew manifest[3] information before departure from the United States (as well as prior to arrival in the United States, for inbound flights). *See* 8 U.S.C. § 1221(b). Airlines cannot do this without examining passports. The manifest information that the statute requires of airlines includes data elements that can only be obtained by reading the passport, such as "passport number and country of issuance." 8 U.S.C. § 1221(c). Failure to submit manifests or failure to submit accurate and full information in such manifests carries a penalty of $1,000 per passenger or crew member for which such accurate and full information was not provided. 8 U.S.C. § 1221(g).

These and other manifest requirements were eventually consolidated under the administration of Customs and Border Protection ("CBP"), an arm of the Department of Homeland Security. *See Electronic Transmission of Passenger & Crew Manifests for Vessels & Aircraft*, 70 Fed. Reg. 17,820 (Apr. 7, 2005).[4] Under CBP's rules implementing Section 402 of the

---

[3] In aviation parlance, a passenger or crew "manifest" is a document providing information about the passengers and crew slated to be aboard a flight, including information about their identities.

[4] Not surprisingly, some passport-handling requirements are included in confidential, government-mandated airline security programs and

Enhanced Border Security Act, airlines must electronically transmit to CBP passenger and crew manifests for flights from and to the United States. *See* 19 C.F.R. §§ 122.75a (departing passengers), 122.75b (departing crew), 122.49a (arriving passengers), 122.49b (arriving crew); *see also* 8 C.F.R. §§ 231.2 (departing passengers and crew), 231.1 (arriving passengers and crew). Again, airlines cannot obtain the data elements required for the manifests without examining passports.

In a section of its rules entitled "*Carrier responsibility for comparing information collected with travel document*," CBP sets forth the following requirement:

> The carrier collecting the [required manifest information for passengers departing the U.S.] is responsible for comparing the travel document presented by the passenger with the travel document information it is transmitting to CBP in accordance with this section in order to ensure that the information is correct, the document appears to be valid for travel purposes, and the passenger is the person to whom the travel document was issued.

---

Transportation Security Administration anti-terrorism directives, which airlines are prohibited from disclosing to the public.

19 C.F.R. § 122.75a(d); *see also* 19 C.F.R. §§ 122.75b(d) (same requirement

with respect to departing crew members); 122.49a(d) (arriving passengers);

122.49b(d) (arriving crew members).

### B.  International Law

The Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat.

1180, TIAS 1591, 15 U.N.T.S. 295 (also known as the Chicago

Convention), to which both the United States and Japan are signatories, also

obligates JAL to examine passports.  "The Chicago Convention is the law of

the land, U.S. Constitution, Article VI, and as a self-executing treaty, carries

the force and effect of a legislative enactment."  *Ricart v. Pan Am. World

Airways, Inc.*, No. Civ. A. 89-0768 (HHG), 1990 WL 236080, at *3 (D.D.C.

Dec. 21, 1990).

Pursuant to several articles in the Chicago Convention related to

facilitation of immigration and customs procedures, the International Civil

Aviation Organization ("ICAO"), an organization created by the Contracting

States and related to the United Nations, has adopted standards that are

binding on the Contracting States.  These standards are found in Annexes to

the Chicago Convention.  Annex 9 ("Facilitation"), Chapter 3, relates to

facilitation of formalities for clearance of aircraft and commercial traffic by

customs, immigration and other authorities. A103-110. Under Annex 9, each of the 190 Contracting States have obligated their international airlines to check travel documents, including passports, before flight departure to facilitate air commerce and to ensure that persons who are not welcome in transit and destination countries are not transported to those countries. A107. Specifically, Section 3.33 provides: "Aircraft operators shall take necessary precautions at the point of embarkation to ensure that passengers are in possession of the documents prescribed by the States of transit and destination for control purposes…." A107.

Iris does not dispute that federal law requires JAL to examine the passports of its passengers. *See* A210 at 16:17-20.

## II.   THE LITIGATION

In late 2006, Iris sued JAL for infringement of the '506 patent relating to "an improved security identification document for use in a wide variety of identification and security systems and a method of making the improved security document." A61 at col. 1, ll. 11-15. The '506 patent includes one independent method claim and six dependent ones. A70 at col 20, ll. 11-64. According to Iris, because the accused passports include a computer chip, they are electronic security documents and they are made by the accused

method (which involves the placing of metal rings around chips in security documents in order to protect them from wear and tear).  A72 ¶¶ 8, 10.

The Complaint asserts that by October 2006, JAL began "processing and/or boarding" passengers issued electronic passports at New York City's John F. Kennedy International Airport (JFK) and JAL check-in facilities in the United States, allegedly "using" a "product" that embodied a patented process.  A74 ¶¶ 18-19.  The parties and the U.S. Government do not dispute that the action taken by JAL is mandated by the U.S. Government.  A210 at 16:17-20.

In June 2007, JAL filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  A53.  JAL's motion presented the following bases for the district court to dismiss:  (1) government-owned and issued passports are not a "product" within the meaning of 35 U.S.C. § 271(g) and JAL's handling of a passport is not a "use" under that same section because a passport is not an item of commerce and JAL is not in the chain of distribution and supply of passports; (2) U.S. national security and border control laws requiring JAL to examine passports (including the Enhanced Border Security Act) conflict with, and cannot be superseded by, Section 271(g); (3) the doctrine of foreign sovereign compulsion insulates JAL from

liability under the patent laws because foreign laws and regulations compel JAL to examine passports in the United States; and (4) Iris' exclusive remedy for any infringement is against the United States Government in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a). A4.

The district court dismissed the case under Federal Rule of Civil Procedure 12(b)(6) based on the conflict between the Enhanced Border Security Act and Section 271(g), holding that, assuming *arguendo* that Iris' claim has merit, JAL "cannot operate its commercial airline within the United States and comply with the Enhanced Border Security Act, without infringing Iris' '506 patent under section 271(g)" and the "interest in our nation's security outweighs IRIS' general commercial interests in its patent under 35 U.S.C. § 271(g)." A39-40, *see also* A10, A14.

The court found that a passport was a "product" and JAL's inspection of a passport was a "use" within the meaning of Section 271(g) and hence, JAL could be liable for infringement under Section 271(g), assuming Iris' claim had merit. A7-8. Because it found that the conflict between the Enhanced Border Security Act and Section 271(g) required dismissal, the court declined to rule on JAL's foreign sovereign compulsion argument. A14.

11

Finally, based on this Court's holding in *Zoltek III*, the district court found that Section 1498(a) did not apply. A13-14 (explaining that under the *Zoltek III* holding, Section 1498(a) did not extend to alleged infringement under Section 271(g) and thus the U.S. Government had not waived immunity for acts of infringement under Section 271(g)). The court observed that "[h]ad the government waived immunity under § 1498(a), it is clear that Japan Airlines would be immunized against private suits." A13-14.

## SUMMARY OF ARGUMENT

The Court's 2012 *en banc Zoltek V* decision controls this case, requiring affirmance. In *Zoltek V*, the Court interpreted 28 U.S.C. § 1498(a) to apply to alleged infringement under 35 U.S.C. § 271(g) and to immunize defendants from liability under that provision when they are acting for, and with the authorization or consent of, the United States. *See Zoltek V*, 672 F.3d at 1325-26. As the district court found, JAL is acting for and with the authorization of the United States. A13-14.

The district court properly dismissed the case under Rule 12(b)(6). Although Iris accused JAL of infringing its '506 patent under Section 271(g) by inspecting U.S. and foreign passports at U.S. airports, A74-75 at ¶¶ 18-

12

21, it is undisputed that JAL's inspection of passports is done on behalf of the U.S. Government and with the U.S. Government's authorization. A210 at 16:17-20; A239-240; Brief for the Unites States as *Amicus Curiae*, Dkt. No. 47 (hereinafter, "U.S. Brief") at 1. And, the district court found that JAL has met the requirements for liability exemption under Section 1498(a). A13. However, the district court correctly recognized that, under the then existing interpretation of Section 1498(a), the United States had not waived immunity. A13. "Had the government waived immunity under §1498(a), it is clear that Japan Airlines would be immunized against private suits." A13. In *Zoltek V*, however, the Court broadened Section 1498(a) to apply to 35 U.S.C. § 271(g) and waive the government's immunity. 672 F.3d at 1327; *see also* U.S. Brief at 10-11. Accordingly, Iris' exclusive remedy for the inspection of passports is against the U.S. Government under 28 U.S.C. § 1498(a), not against JAL. This Court should affirm.

Alternatively, the Court may affirm based on the district court's ruling that the national security requirements of the Enhanced Border Security Act take precedence over the patent liability statute. A10. The court correctly determined that, assuming *arguendo* that Iris' claim has merit, a conflict exists between the Enhanced Border Security Act and 35 U.S.C. § 271(g),

13

and the national security interests underlying the Enhanced Border Security Act prevail over Iris' narrow, commercial interest in its patent. *Id.*

The U.S. Government directs JAL, like all airlines operating international flights from the United States, to inspect the passport of every passenger and crew member. A240. If, for example, a potential passenger is on the "no-fly list" maintained by the U.S. Transportation Security Administration, an airline cannot provide the passenger a boarding pass. Thus, to the extent Iris' patent infringement claim against JAL has merit, a federal law *compels* JAL to take the very action that another federal law proscribes. Iris cannot evade this irreconcilable conflict. Because this country's security interests, which underlie the Enhanced Border Security Act of 2002, outweigh Iris' private, commercial interest created by the Process Patents Amendments Act of 1988, the district court's decision should be affirmed.

Other arguments also support upholding the district court's dismissal of Iris' Complaint. Passports are not items of commerce; they cannot be bought or sold, and they remain the property of the governments that issue them. *See* 22 C.F.R. § 51.7. Further, JAL handles passports involuntarily under government compulsion for national security and border control

purposes and would be subject to penalties and fines for any failure to do so;

JAL is not in the chain of distribution and supply of passports.  As such, a

passport (including e-passports) is not a "product" as that term is used in 35

U.S.C. § 271(g); JAL's inspection of a passport is not a "use" within the

meaning of Section 271(g); and thus, the inspection of passports cannot

constitute an infringement under that provision.

Additionally, the foreign sovereign compulsion doctrine bars Iris'

claims.  As with U.S. law, the laws of multiple nations require that JAL and

other airlines inspect the passports of passengers destined for airports in their

respective countries.  JAL should be deemed immune from liability since its

inspection of passports of passengers and crew members departing the

United States is compelled by foreign nations.

## STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), courts are to

accept as true all factual allegations in the complaint, make inferences from

those allegations in the light most favorable to the plaintiff, and liberally

construe the complaint.  *See, e.g., Gregory v. Daly,* 243 F.3d 687, 691

(2d Cir. 2001).  Dismissal should be affirmed where "it is clear that no relief

could be granted under any set of facts that could be proved consistent with

the allegations." *Anaheim Gardens v. United States*, 444 F.3d 1309, 1315

(Fed. Cir. 2006).

In reviewing district court judgments on non-patent issues, the Federal

Circuit generally applies the law of the circuit in which the district court sits.

*Danisco U.S. Inc. v. Novozymes A/S*, – F.3d –, 2014 WL 929348 at *7 (Fed.

Cir. 2014); *see also Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d

850, 857-58 (Fed. Cir. 1991). Federal Circuit law applies to patent law

issues. *Ohio Willow Wood Co. v. Alps South, LLC.,* 735 F.3d 1333, 1342

(Fed. Cir. 2013). Issues of statutory construction are reviewed by the

Federal Circuit without deference. *Bayer AG v. Housey Pharm., Inc.*, 340

F.3d 1367, 1370-71 (Fed. Cir. 2003) (internal citations omitted).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED IRIS' CLAIM BECAUSE SECTION 1498(a) REQUIRES IRIS TO SEEK RECOVERY ONLY FROM THE UNITED STATES

### A. Where Federal Law Mandates A Specific Action, The United States Is The Only Proper Defendant

Title 28 of U.S.C. § 1498(a) requires that, when the U.S. Government

has directed an accused infringing use, a patentee's sole remedy is against

the U.S. Government:

> [w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, *the owner's remedy shall be by action against the United States* in the United States Court of Federal Claims for the recovery of his reasonable *and entire* compensation for such use and manufacture.

28 U.S.C. § 1498(a) (emphasis added).  And:

> the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation *for the Government and with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States.

*Id.* (emphasis added).

In 1928, the Supreme Court confirmed immunity from suit for patent infringement for government contractors while acting for the United States. *See Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 342-343 (1928) (interpreting the Act of 1918, a predecessor statute to Section 1498). The Court explained that the "intention and purpose of Congress in the Act of 1918 was to stimulate contractors to furnish what was needed for the War, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents." *Id.* at 345.

Here, the parties do not dispute that the United States requires JAL to inspect the passports of its passengers and crew members.  A13; A210 at

17

16:17-20; A239-240; U.S. Brief at 1. In performing this duty, JAL is acting pursuant to an express directive of the United States. *See* 8 U.S.C. § 1221(b); *see also* 19 C.F.R. §§ 122.75a, 122.75b; 8 C.F.R. § 231.2. JAL's obligation to comply with these federal requirements satisfies Section 1498(a). 28 U.S.C. § 1498(a).

Indeed, the United States' Statement of Interest and its amicus brief in this case confirm that it has required JAL to act on its behalf when JAL examines U.S. and foreign passports:

> To promote the border security of the United States, the federal government requires airlines to examine the passports of persons arriving into and departing from the United States. The United States has an interest in ensuring that airlines can carry out this important function without the disruptions that would occur if inspecting passports exposed airlines to the liability and remedies available under Title 35 of the United States Code.

U.S. Brief at 1; *see also* A239-240. Accordingly, under Section 1498(a), Iris' exclusive remedy for the alleged infringement lies against the United States, not JAL. The statute explicitly covers JAL's actions examining both U.S. and foreign passports: "use … of an invention described in and covered by a patent of the United States." 28 U.S.C. § 1498(a).

### B. The *En Banc* Decision in *Zoltek V* Confirms Iris' Remedy Lies With The United States

#### 1. *Zoltek V* Broadened The Interpretation Of Section 1498 To Cover Accusations Under Section 271(g)

The recent *en banc* decision by this Court in *Zoltek V* confirms Section 1498(a)'s mandate: that Iris' sole remedy for alleged infringement lies against the U.S. Government.  When the district court issued its 2009 decision, *Zoltek III* limited application of Section 1498(a) to infringement under 35 U.S.C. § 271(a) only, and not processes under Section 271(g). Relying on the *Zoltek III* precedent, the district court concluded that Section 1498(a) could not apply, even though JAL "meets the two requirements of § 1498(a)" that "(1) the accused use or manufacture was undertaken for the Government, i.e., for the Government's benefit; and (2) the Government gave its authorization or consent for the accused use or manufacture."  A13. Based on this analysis, the district court found that "[h]ad the government waived immunity under § 1498(a), it is clear that Japan Airlines would be immunized against private suits."

However, in *Zoltek V*, the Court broadened the interpretation of Section 1498(a) to cover infringement under Section 271(g), holding that the more restrictive *Zoltek III* interpretation was inconsistent with the plain

language of Section 1498(a), improperly limited the protection provided to entities acting for the U.S. Government, and vitiated "the Congressional scheme, spread across three Titles in the United States Code, see 35 U.S.C. §§ 154(a)(1), 271(g), 19 U.S.C. § 1337, and 28 U.S.C. § 1498, which is meant to give relief to process patent holders when the resulting products of their patented process are used within the United States – regardless of where the process is practiced." *Zoltek V*, 672 F.3d at 1315.

In *Zoltek V*, the Court considered whether Lockheed, a government contractor, was immune from suit under Section 1498(a) for its use of a product made using the patented process and whether Lockheed's actions created governmental liability. *Id.* at 1323. Regarding Lockheed's use of the patented invention, the Court noted that, although the process was at least partially practiced outside the U.S., the product resulting from that process was imported into or used in the United States. *Id.* The Court observed that in 1988, Section 271(g) was added to clarify that violating a patent holder's grant under 35 U.S.C. § 154(a), by selling in the U.S. or importing products into the U.S. made under a patented process, was an act of infringement. *Id.* at 1324. Thus, the Court held that, based on the 1988 amendments to the Patent Act and the mandates in 19 U.S.C. § 1337, a use

20

or importation within the United States of a product manufactured by a process patented in the U.S. constitutes a use under Section 1498(a). *Id.* at 1325-26.

The Court determined that Lockheed's use of the product made by the patented process was unlawful under Section 271(g). *Id.* at 1325. However, because the U.S. was subject to suit under Section 1498(a), Lockheed, as a contractor to the U.S. Government, was immune from individual liability for the alleged infringement. *Id.* at 1327. In making this decision, the Court stated that the plain language of Section 1498(a) "waives the Government's sovereign immunity from suit when (1) an invention[5] claimed in a United

---

[5] The Court found that Lockheed used Zoltek's patented invention when Lockheed used the product made by the patented process in the United States. It held that "the products themselves embody the patented invention for the purposes of Section 1498." The Court recognized that it could be argued that using the resulting product "is not the same as 'use' of the invention under the literal terms of Section 1498 because the process itself is the invention, not the resulting products." However, the Court rejected this argument, finding that "the product of a patented process is not only the product, but also the physical embodiment of the invention." *Id.* at 1325.

21

States patent; (2) is 'used or manufactured by or for the United States,' meaning each limitation is present in the accused product or process; and (3) the United States has no license or would be liable for direct infringement of the patent right for such use or manufacture if the United States was a private party." *Id.* at 1319.

### 2. The District Court Properly Found That JAL Satisfied The Requirements For Exemption Under Section 1498

The holding of *Zoltek V* controls here. When the facts of Iris' Complaint are taken as true the following emerge: (1) Iris' '506 patent claims a process for manufacturing a "secure electronic passport," A72 ¶ 8; (2) the accused infringement is JAL's inspection in the United States of passports allegedly made using the process of the '506 patent A74-75 ¶¶ 18-21; and (3) Iris has not licensed the United States under the '506 patent. A251. Moreover, the parties and the United States agree that JAL's inspection of passports in the United States is done for the United States; Iris conceded this point at oral argument. A210 at 16:17-20; *see also* U.S. Brief at 1 and 8; A239-240; A3; A13. Therefore, Section 1498(a) plainly applies: the United States has waived its sovereign immunity and is the only

appropriate defendant. *See Zoltek V*, 672 F.3d at 1324-26; *see also* Dkt No. 47 at 17-18.

Even though the defendant in *Zoltek* was operating under a contract with the United States, Section 1498 is not so limited. *See, e.g.*, *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976) (holding that authorization and consent may be given implicitly, for example, "by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, by post hoc intervention of the Government in pending infringement litigation against individual contractors").

Here, JAL is acting pursuant to express directives of the United States.[6] Indeed, the case for application of Section 1498 is even more compelling here than in the case of contractors because the United States compels JAL to inspect passports of its passengers and crew. JAL is not

_____

[6] As noted, federal laws require JAL to examine passports in order to provide U.S. border officials with certain passenger and crew manifest information before departure from the United States, including passport numbers, passport country of issuance, and passport expiration dates. *See* 8 U.S.C. § 1221(b); *see also* 19 C.F.R. §§ 122.75a, 122.75b; 8 C.F.R. § 231.2.

acting for its own commercial benefit.  Rather, JAL stands in the shoes of

the Government when it performs this governmental function.  Moreover,

the United States has accepted responsibility for the inspection requirements.

"JAL's examination of passports is both 'for the Government' and 'with the

authorization and consent of the Government;'" A238-241, U.S. Brief at 1

and 8; immunizing JAL from suit under Section 1498(a).

In accordance with the plain language of Section 1498(a) and the

*Zoltek V* decision interpreting it, Iris' exclusive remedy for JAL's

examination of allegedly infringing passports lies against the United States,

not JAL.  The decision of the court below should therefore be affirmed.

If the Court agrees with JAL's analysis under Section 1498, it need

not reach the additional bases for affirmance that follow.

## II. THE DISTRICT COURT PROPERLY DETERMINED THAT IN THIS CASE NATIONAL SECURITY INTERESTS OUTWEIGH IRIS' PRIVATE, COMMERCIAL INTEREST

### A. The District Court Concluded That A Conflict Exists Between Two Statutes

#### 1. The Enhanced Border Security Act Mandates JAL Examine Passports

Iris concedes that federal law requires JAL to examine the passports

of its passengers and crew members.  *See* A210 at 16:17-20.  Section 402 of

the Enhanced Border Security Act amended Section 231 of the Immigration and Nationality Act, 8 U.S.C. § 1221, to require airlines to provide U.S. border officials with certain passenger and crew manifest information before departure from the United States (as well as prior to arrival in the United States, for inbound flights). *See* 8 U.S.C. § 1221(b). Airlines cannot do this without examining passports. The manifest information required by the statute includes data elements that can only be obtained by reading the passport, such as "passport number and country of issuance." 8 U.S.C. § 1221(c). Failure to submit manifests or failure to submit accurate and full information in such manifests carries a penalty of $1,000 per passenger or crew member for which such accurate and full information was not provided. 8 U.S.C. § 1221(g).

CBP's regulations implementing the Enhanced Border Security Act, require airlines to electronically transmit passenger and crew manifests to CBP for flights from and to the United States. *See* SOF at pg. 7-8 *supra*; *see also* 19 C.F.R. §§ 122.75a (departing passengers), 122.75b (departing crew), 122.49a (arriving passengers), 122.49b (arriving crew); 8 C.F.R. §§ 231.2 (departing passengers and crew), 231.1 (arriving passengers and crew). Airlines cannot obtain the data elements required for the manifests without

examining passengers' passports.  Moreover, JAL is responsible for

comparing information collected with travel documents.  *See* SOF at pg. 9

*supra*; 19 C.F.R. §§ 122.75a(d), 122.75b(d), 122.49a(d), 122.49b(d).

### 2.    If Iris' Infringement Claim Has Merit, The Requirement To Examine Departing Passenger Passports Conflicts With 35 U.S.C. § 271(g)

Iris' argument that the requirements of the Enhanced Border Security

Act do not conflict with the Patent Laws of the United States because the

former contains no exemption from the latter misses the point.  Bl.Br. at 7-8.

The very fact that there is no exemption leads inexorably to the conclusion

that one federal law compels JAL to violate another federal law.  The district

court properly considered and rejected Iris' argument, concluding:

> It is undisputed that the Enhanced Border Protection Act
> requires Japan Airlines to examine the passports of departing
> passengers at domestic airports and therefore the airline must
> infringe Iris' '506 patent, assuming, *arguendo,* that Iris's claim
> has merit.

A10.  Iris has provided no argument that the district court's interpretation of

the Enhanced Border Security Act is incorrect.  Bl.Br. at 7-8.  As the district

court concluded, assuming *arguendo* that Iris' infringement claim has merit,

one federal law *compels* JAL to violate another federal law, A10, creating a

conflict of laws.

Iris' mistaken assertion about JAL's ability to overcome the conflict by paying a license fee, Bl.Br. at 5, ignores the fundamental facts about JAL's examination of passports:  (1) JAL stands in the shoes of the government when it performs the governmental function of inspecting passports, A11, U.S. Brief at 12; (2) JAL derives no commercial benefit from examining passports, and such examination is not part of the transportation service that JAL provides A11; and (3) JAL is compelled by the U.S. and other governments to examine passports, and it has no choice regarding what kind of passports it must examine.  A11.

Iris' attempt to analogize airlines' obligation to comply with the Enhanced Border Security Act to the obligation to have certain equipment, such as altimeters adjustable for barometric pressure, on each aircraft also fails.  Bl.Br. at 10.  According to Iris, "JAL has no more of a right" to inspect the accused passports than it has to the free use of this equipment. *Id.*  However, rather than JAL's right, the United States and other governments *require* JAL to inspect the accused passports.   The district court correctly found that Iris' argument lacks merit.  A10-11.

Equipment such as altimeters is available for purchase in the open market.  If a particular device potentially infringes a patent, a manufacturer

can choose to design around the patent. Similarly, airlines can purchase such equipment from different manufacturers based on their analysis of many factors, including potential patent infringement. In contrast, passports are unique documents that are the property of the government that issues them. *See e.g.* 22 C.F.R. § 51.7. It is not up to JAL to decide to purchase passports or not; passports are not articles of commerce.

Further, equipment such as altimeters is part of air transportation service that affords an airline with a commercial benefit. JAL's handling of passports is not part of the service it seeks to provide, nor does it provide JAL with any commercial benefit. Rather, JAL examines passports because it is required by governments to do so for national security and border control purposes. *See* SOF at pg. 6-7 *supra*. National security and border control are governmental functions, and governments have instructed JAL to assist them to carry out these functions by inspecting passports. *See e.g.* U.S. Brief at 11-12. Neither JAL nor any other airline operating international flights from the United States has any choice but to inspect passports.

For these reasons, the district court found Iris' analogy to equipment that JAL purchases to provide transportation services wholly unpersuasive:

> In this case, Japan Airlines is not being provided passports for free. Rather, it is compelled to examine them pursuant to laws designed to protect the national security of the United States. The airline has no control over the types of passports presented to it for inspection and has no way to avoid the allegedly infringing activity. And, as noted above, it obtains no commercial benefit whatsoever from its allegedly infringing action.

A11.

## B. The District Court Properly Applied *SmithKline* To Dismiss The Complaint

### 1. *SmithKline* Sets Forth The Conflict of Laws Analysis

For guidance in resolving the conflict between the requirements of the Enhanced Border Security Act and the protections offered to patent holders under 35 U.S.C. § 271(g), the district court followed the analytical framework set forth in *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 211 F.3d 21 (2d Cir. 2000). In *SmithKline,* the Second Circuit dismissed a claim of copyright infringement because a statute concerning generic drugs, the Hatch-Waxman Amendments, mandated the use of specific copyrighted labeling information. *Id.* at 29. The Second Circuit held that the copyright laws should be construed not to apply where generic drug producers were specifically required by another federal law to

take the action that the plaintiff pioneer drug producer alleged violated the copyright laws. *Id.*

The Second Circuit resolved the conflict by applying the "familiar canon that, where two laws are in conflict, courts should adopt the interpretation that preserves the principal purposes of each." *SmithKline,* 211 F.3d. at 27-28 (citing *Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1347 (Fed. Cir. 1999)). The *SmithKline* court found additional support for its holding by giving weight to the statutes' priority of enactment and specificity in reconciling the conflict. *Id.* at 28 n. 3 (citing *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000)).

Following this analytical framework, the district court observed that "the principal purpose of § 271(g) is to protect process patents holders from economic loss when the holder's patented process is performed abroad and the products of that process are brought into the United States." A9. The court concluded that the vital purpose of the Enhanced Border Security Act to promote national security outweighs the narrow commercial interest of Iris in its patent under Section 271(g). The court explained:

> [C]reating an exception to patent enforcement in this limited
> context will hardly open the floodgates to widespread
> uncompensated infringement. This case is not within the
> heartland of patent infringement suits. Japan Airlines, the

alleged infringer, is not a competitor of the plaintiff nor does it derive any commercial or financial benefit from the alleged infringing activities which an Act of Congress compels it to commit.

A11.

The district court also noted "the statutes' priority of enactment – the fact that the Enhanced Border Security Act was enacted fourteen years after the patent statute was amended to include § 271(g) favor[s] the conclusion that the Enhanced Border Security Act should override § 271(g)." A9. Moreover, Section 271(g)'s broad generality contrasts with the specific national security and safety scheme in the Enhanced Border Security Act and implementing rules that explicitly require airlines to handle passports. A10.

### 2.     Iris' Arguments Against *SmithKline* Logically Fail

Iris acknowledges that, due to conflicting statutes, the defendant in *SmithKline* faced a choice of altering its generic drug label and losing the necessary FDA approval, or infringing the plaintiff's copyright. Bl.Br. at 16. Despite the clear parallel, Iris argues that the present case is different from *SmithKline* because JAL can comply with the Enhanced Border Security Act and avoid infringing the '506 patent by paying a licensing fee. Bl.Br. at 17. Again, Iris misses the point; as was the case in *SmithKline*,

JAL must (to the extent Iris' claim has any merit) infringe to comply with another federal law mandate. For this reason, the district court properly held that "requiring Japan Airlines to secure a license is not a satisfactory resolution of this conflict." *See, e.g.,* supra at 29; *see also* A10-11.

Iris incorrectly asserts that *SmithKline* should not apply because allowing JAL to use Iris' patent without compensation would undermine the policies underlying the patent laws. Bl.Br. at 17. The court in *SmithKline* held that allowing the defendant to use the copyrighted drug label would not meaningfully undermine the Copyright Act. 211 F.3d at 28. Similarly, the district court here held that the patent laws would not be meaningfully undermined because "creating an exception to patent enforcement in this limited context will hardly open the floodgates to widespread uncompensated infringement." A11. Indeed, JAL's mandatory examination of passports is a unique circumstance that has few, if any, analogies outside the context of international travel and border controls.

Iris also mistakenly asserts that permitting JAL's passport examination without compensation to Iris will destroy the incentive to create. BlBr. At 17. But Iris has the opportunity to be compensated for the

alleged infringement. Bl.Br. at 17. Iris can assert its patent against the United States. 28 U.S.C. § 1498(a).

In any event, the district court did not ignore the possibility that the incentive to create would be diminished. In fact, it recognized that "[a]ny abrogation of the exclusive rights of the patent holder would undermine the overall purpose of the patent statute, namely, 'to promote the progress of science.'" A9 (citing U.S. Const. Art. I, §8). The district court further acknowledged that incentive to create is diminished where infringement is permitted without recourse to damages. A9. Recognizing these competing interests, the district court balanced its limited exception to enforcement with the need to protect the United States. *Id.*

In addition, this case "is not within the heartland of patent infringement suits" since JAL "is not a competitor of the plaintiff nor does it derive any commercial or financial benefit from the alleged infringing activities which an Act of Congress compels it to commit." A11. Further, affirming the dismissal would not invalidate Iris' patent or preclude Iris from seeking to enforce its patent against, for example, manufacturers who

without authority use its patented process, making its arguments about
diminished incentive less persuasive.[7]

## III. OTHER ARGUMENTS SUPPORT UPHOLDING THE DISTRICT COURT'S DISMISSAL

### A. JAL's Passport Examination Falls Outside The Scope Of Section 271(g)

#### 1. A Passport Is Not A "Product" Under Section 271(g)

While JAL agrees that the Enhanced Border Security Act's purpose to
promote national security plainly outweighs Iris' private, commercial
interest in its patent and that the Complaint was appropriately dismissed, the
Court alternatively could reconcile the two statutes by construing Section
271(g) to avoid a conflict, i.e., such that a "product" under Section 271(g)
does not include an issued passport.

The Court previously has found Section 271(g) to be ambiguous. *See,
e.g. Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367, 1371-75 (Fed. Cir.
2003) (stating that the term "made" in 35 U.S.C. § 271(g) was ambiguous as
to whether it covered the production of information or only physical
products). The legislative history of Section 271(g) demonstrates that it was

---

[7] The Second Circuit's decision in *SmithKline*, on the other hand,
effectively gutted the copyright owner's copyright. 211 F.3d at 29.

enacted to address "goods destined to travel in the stream of commerce."
*British Telecomms. v. SBC Commc'ns*, Civ. Nos. 03-526-SLR, 2004 U.S.
Dist. LEXIS 29772, at *8 (D. Del. Feb. 24, 2004). By contrast, issued
passports remain the property of the issuing government and are not articles
of commerce that are imported into or marketed, bought or sold in the
United States; thus, they do not "travel in the stream of commerce." *See,
e.g.*, 22 C.F.R. § 51.7; *United States v. Laub*, 385 U.S. 475, 481 (1967) ("A
passport is a document identifying a citizen, in effect requesting foreign
powers to allow the bearer to enter and to pass freely and safely, recognizing
the right of the bearer to the protection and good offices of American
diplomatic and consular officers."); *see also Worthy v. United States*, 328
F.2d 386, 391 (5th Cir. 1964). As such, a passport is not a "product" under
Section 271(g).

The sparse case law on the meaning of the word "product" in Section
271(g) supports the interpretation that Congress intended to reach only
goods imported into the U.S. as part of a chain of commercial distribution
and supply. In *Bayer AG*, 340 F.3d at 1373-74, the Court relied on 19
U.S.C. § 1337, which addresses unfair methods of competition in import
trade, to construe Section 271(g):

> Section 271(g) was not enacted on an entirely blank slate. Rather, it was designed to provide new remedies to supplement existing remedies available from the International Trade Commission ("ITC") under 19 U.S.C. § 1337 (2000). *See* H.R. Rep. No. 100-60 at 8-9. Section 1337 (Section 337 of the Tariff Act of 1930) defines "[u]nfair methods of competition" in import trade. 19 U.S.C. § 1337(a)(1)(A) (2000). One of these statutory "unfair methods of competition" is the "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that . . . are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent." 19 U.S.C. § 1337 (a)(1)(B); *see also* 19 U.S.C. § 1337(a)(1)(A) (referring to "unfair acts in the importation of articles"). When enacting § 271(g), Congress recognized the availability of redress from the ITC, but noted that the remedies available thereunder were insufficient to fully protect the owners of process patents. H.R. Rep. No. 100-60 at 8-9. Thus, the legislative history suggests that section 271(g) was intended to address the same "articles" as were addressed by section 1337, but to add additional rights against importers of such "articles."

340 F.3d at 1373-74 (alteration in original). Section 1337, which covers articles that are imported and sold, informs that Section 271(g) likewise covers only such articles, and not items such as government-owned passports, which remain entirely outside the stream of commerce.

Congress' use of the word "product" indicates its intent to restrict the scope of Section 271(g) to goods that are manufactured for commercial sale. Passports are not distributed commercially. Because they do not enter the stream of commerce, they fall outside this definition. Both the legislative

history and harmonization principles lead to the same result via the different path of interpreting "product" more narrowly to exclude passports. Such interpretation presents an alternative ground for affirming the district court's dismissal of Iris' Complaint.

## 2. JAL's Examination Of A Passport Is Not A "Use" Under Section 271(g)

The problem that Congress sought to address by Section 271(g) was the use by foreign manufacturers of a U.S.-patented process to manufacture products overseas that are subsequently imported into, and sold in, the United States. *See Allegheny Ludlum Corp. v. Nippon Steel Corp.*, 765 F. Supp. 224, 226 (E.D. Pa. 1991). Congress' primary target was the foreign manufacturer. *Id.* ("Congress made it clear in the legislative history to this Act that the target of the statute was the foreign manufacturer.").[8] However,

_____

[8] *See also Pfizer Inc. v. Aceto Corp.*, 853 F. Supp. 104, 105 (S.D.N.Y. 1994) ("Prior to the enactment of § 271(g), a process patent holder had a remedy under the patent laws only if the unauthorized use of [its] patented process occurred within the United States. A process patent holder had no remedy against a foreign company that manufactured goods using the patented process and subsequently imported the goods into the United

recognizing that the foreign manufacturer might not be subject to suit in the

United States, Congress provided a cause of action against entities that

purchase the product from the manufacturer or downstream sellers.

Congress indicated that it would be fair to hold purchasers (particularly

those who purchase directly from the foreign supplier) liable for the

supplier's unauthorized use of a patented process because of their

connections to the supplier:

> In approving S.1200, the Committee rejects the
> view that the U.S. *purchaser* from an overseas
> manufacturer who makes goods using a process
> patented in the United States has no responsibility
> for the patent infringement involved.  On the
> whole, it should be the burden of business
> entrepreneurs who *purchase goods* to check
> beforehand for possible infringement . . . .
>
> Since the manufacturer may not be subject to
> jurisdiction, S.1200 also allows the patentholder to

States.  Section 271(g) was enacted to provide such a remedy…."); 

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1347 (Fed.

Cir. 2000) (Before Section 271(g), "the holder of a United States process

patent had no recourse against one who practiced the process abroad and

imported the product.  The purpose of § 271(g) was to close this loophole

and bring the United States law into conformity with that of other nations.").

38

> sue the persons *receiving the goods* in this country
> in the belief that they may be in the best position,
> apart from the manufacturer, to determine how the
> goods were made.

S. Rep. No. 100-83, at 39 (1987) (emphasis added). Congress reasoned that

it would not be inequitable to expose such persons to liability because they

could protect themselves from infringement claims by imposing conditions

on the foreign manufacturer or by seeking indemnification from their

supplier:

> The U.S. *purchaser* may protect itself in a number
> of ways: by specifying *in the contract* how goods
> are to be made, or by eliciting a *contractual*
> commitment from the foreign manufacturer either
> to come into the U.S. courts itself to defend an
> infringement suit or to indemnify the *purchaser*
> against such suit.

*Id.* at 39-40 (emphasis added). *Cf. Tec Air, Inc. v. Nippondenso Mfg. U.S.A.,*

*Inc.*, No. 91 C 4488, 1997 WL 49300, at * 3 (N.D. Ill. Jan. 30, 1997) ("This

court interprets 271(g) to apply only to the entity that actually imports the

patented product into the United States or the entity that sells the patented

product after it reaches the United States.").

It seems plain that Congress did not intend Section 271(g) liability to

attach to an entity that is not *somewhere* in the chain of distribution and

supply of passports. Assuming that there is in fact a chain of distribution

and supply of passports, there is not even a hint in the legislative history that Congress meant to impose liability on an entity completely outside the chain. To the contrary, the legislative record speaks in terms of manufacturers, importers, sellers and buyers, i.e., entities in the chain of distribution and supply.

JAL, on the other hand, is nowhere in any chain of distribution and supply of passports.[9] By its government-mandated (and thus involuntary)

---

[9] Indeed, Iris does not allege that JAL manufactures passports. It does not allege that JAL imports or sells them, or that JAL purchases them. It does not allege that JAL does anything differently with e-passports than it does with non-e-passports. Rather, Iris merely parrots the language of the statute by alleging that JAL "uses" passports in its check-in and boarding procedures. A74 ¶¶ 18-19. It provides no facts in support of this allegation. *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 2004 WL 1872707, at *1 (S.D.N.Y. Aug. 19, 2004) (dismissing claim under Fed. R. Civ. P. 8(a) that "merely parrot[ed] the elements of a claim for patent misuse, without alleging even general facts to support that claim"); *Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F. Supp. 948, 962 (S.D. Cal. 1996) ("Rule 11's requirement of the well-foundedness of the factual contentions of the

examination of passports, JAL does not place itself in that chain.[10]

Therefore, JAL's examination of passports – done (a) involuntarily at the direction of governments for their national security and (b) not as a manufacturer, importer, seller or buyer of passports – is not a "use" for

complaint would be meaningless unless Rule 8(a)(2) required some minimum allegations of fact to support the claim.").

[10] Courts have interpreted the language of Section 271(g) narrowly in light of its legislative history. *See Bayer AG*, 340 F.3d at 1372 (determining that court "must look beyond the particular language [of Section 271(g)] being construed"); *British Telecomms. v. SBC Commc'ns*, Civ. Nos. 03-526-SLR, 03-527-SLR, 03-528-SLR, 2004 U.S. Dist. LEXIS 29772, at *9 (D. Del. Feb. 24, 2004) ("The court cannot honestly say that the facts at bar fit within the meaning of the statute as illuminated by the legislative history. Therefore, defendant's [Rule 12(b) motions to dismiss] shall be granted.") (footnote omitted); *Monsanto Co. v. Syngenta Seeds, Inc.*, 431 F. Supp. 2d 482, 487 (D. Del. 2006) (granting summary judgment when "'the fundamental purpose underlying passage of [Section 271(g)] has absolutely no application'") (*quoting British Telecomms.*, 2004 U.S. Dist. LEXIS 29772).

which JAL must answer in damages or royalties to Iris for patent

infringement under Section 271(g).

### 3. If Applied To A Passport, "Product" And "Use" In 35 U.S.C. § 271(g) Should Not Be Interpreted To Undermine National Security

Proper construction of the terms "product" and "use" in Section

271(g) supports national security purpose of the later-enacted, more specific

Enhanced Border Security Act.  As the Supreme Court has instructed:

> The classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.  This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand….  [A] specific policy embodied in a later federal statute should control our construction of the earlier statute, even though it has not been expressly amended.

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)

(internal quotations, brackets and citations omitted) (alteration in original);

*see also id.* at 133 ("[T]he meaning of one statute may be affected by other

Acts, particularly where Congress has spoken subsequently and more

specifically to the topic at hand.").  Of course, if the Court were to interpret

"product" and/or "use" such that Section 271(g) does not apply to JAL's

examination of passports, Section 1498(a) would not be triggered, since

42

there would be no act of infringement. Either way, affirmance of the district court's dismissal is the proper outcome.

**B.** **The Doctrine Of Foreign Sovereign Compulsion Bars Iris' Claim**

**1.** **Foreign Sovereign Compulsion Is A Complete Defense To Iris' Claim Of Patent Infringement**

The doctrine of foreign sovereign compulsion provides an additional ground for upholding the District Court's dismissal of Iris' Complaint. Under this doctrine, a private party is exempt from liability for actions that are compelled by a foreign sovereign. *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D. Del. 1970). The actions of the private party "become effectively acts of the sovereign" when so compelled. *Id.* The doctrine is based on a judicial recognition that it is unfair to impose liability on a private party that is compelled to act by a foreign sovereign under threat of penalties, as well as on notions of sovereignty, comity and foreign relations. *Id.* at 1297-99; *see also* 1 *Restatement of the Law (Third) on the Foreign Relations of the United States* § 441 (1987); Don Wallace, Jr. & Joseph P. Griffin, *The Restatement and Foreign Sovereign Compulsion: A Plea for Due Process*, 23 Int'l Law. 593,

594 (1989) (hereafter, "*Wallace*") ("Foreign sovereign compulsion is based on both international comity and due process/fairness components.").

Although the doctrine of foreign sovereign compulsion was first articulated in the antitrust context, it has been applied in other kinds of cases and, indeed, the subject matter of the case is not a pertinent criterion under the *Restatement* § 441. *See, e.g.*, *Societe Internationale v. Rogers*, 357 U.S. 197, 211-12 (1958) (discovery); *Airline Pilots Ass'n, Int'l. v. Quesada,* 748 F.2d 892, 965 (2d Cir. 1960) (employment); *see also Wallace*, *supra*, at 596 (observing that the foreign sovereign compulsion doctrine is not limited to antitrust and discovery cases). Iris has provided no reason why principles underlying the foreign sovereign compulsion doctrine do not apply equally to patent infringement claims.

The Southern District of New York has determined that actions taken to comply with foreign aviation regulations are the kind of compelled behavior protected by the foreign sovereign compulsion doctrine. In *McElderry v. Cathay Pacific Airways, Ltd.*, 678 F. Supp. 1071 (S.D.N.Y. 1988), the court dismissed an antitrust complaint relating to alleged overcharges for excess baggage loaded in the U.S. in part because foreign laws compelled the defendant's conduct.

44

The court determined that the airline had "convincingly demonstrated that its baggage charge system for baggage originating in the United States is necessitated by the United Kingdom's regulatory system." *Id.* at 1079. Accordingly, the court concluded that the case was one in which "'the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government,' and because 'the conduct of the [defendant] has been compelled by the foreign government,' the defendant 'is entitled to assert the defense of foreign government compulsion and the act of state doctrine is applicable.'" *Id.* at 1080 (*quoting O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 453 (2d Cir. 1987) (alteration in original)).

To make out the defense of foreign sovereign compulsion, a party must show only that the allegedly unlawful action was compelled by a foreign government and that the foreign order was "basic and fundamental" and not merely peripheral to the overall course of conduct. *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979). "Once governmental action is shown further examination is neither necessary nor proper." *Interamerican*, 307 F. Supp. at 1301.

## 2. JAL Must Comply With Foreign Laws Requiring Examination Of Passports

Under the U.S.-Japan agreements regarding air services, virtually all of JAL's passenger flights departing from the United States must operate directly to Japan. *See e.g.* A117-118. One flight is authorized to also serve Brazil.[11] Both Japan and Brazil compel JAL to inspect passports of passengers that JAL boards in the United States for the obvious purpose of controlling who may enter their territory. JAL is subject to penalties if it fails to comply with these foreign-law passport inspection requirements. A159.

Specifically, Chapter 6, Article 56-2 of the Japanese Immigration Control and Refugee Recognition Law requires airlines to check passports presented by their passengers: "A carrier operating a vessel etc. that is to enter Japan (when there is no carrier, the captain of such vessel etc.) must check the passport, crew ledger or re-entry permit of a person wishing to board such vessel etc. in order to prevent aliens from illegally entering

---

[11] JAL discontinued its flight from the United States to Brazil in 2010.

46

Japan."[12]  In addition, under Japan's Advance Passenger Information for

Passengers Entering into Japan ("APIS") Rules, the Ministries of Finance

and Justice and the National Policy Agency require for domestic security

purposes that, for all flights from overseas to Japan, airlines send passenger

information, including name, date of birth and passport number, to

government authorities at least 90 minutes before arrival.[13]  No boarding

---

[12] *See* Japanese Immigration Control and Refugee Recognition Law

(Gov't Order No. 319, Oct. 4, 1951), ch. 6, art. 56-2, at

http://www.moj.go.jp/NYUKAN/NYUKANHO/ho07.html.  Japanese and

Brazilian foreign laws discussed herein are included in the Appendix at

A150-194.  The Appendix also contains an English version of the pertinent

provisions of the Japanese Immigration Control and Refugee Recognition

Law, prepared by the Japanese Ministry of Justice at A166-169.  *See* Fed. R.

Civ. P. 44.1 ("The court, in determining foreign law, may consider any

relevant material or source….  The court's determination shall be treated as

a ruling on a question of law.").

[13] The Japanese APIS Rules became effective on February 1, 2007.

*See* Japanese Customs Act (Law No. 61, Apr. 2 1954) (Excerpts), art. 15,

para. 7; art. 114, paras. 1-2; Japanese Customs Act Enforcement Order

pass may be issued without collecting the necessary data. Fines of

JPY500,000 per flight are imposed for failure to comply with the APIS

Rules, including for not filing information by the specified deadline or for

filing false information. A159. There are analogous Brazilian regulations.[14]

Because foreign law compels JAL to examine passports of passengers on its

flights departing the United States, the doctrine of foreign sovereign

compulsion exempts JAL from liability for such action. JAL cannot

reasonably be expected to ignore foreign law, especially the law of its own

homeland, Japan.

---

(Gov't Order No. 150 of 1954) (Extract), art. 13, paras. 1-4, at

http://www.customs.go.jp/news/news/advance_j/ordinance.pdf.

[14] *See* Brazilian Law No. 6.815, Aug. 19, 1980, D.O.U. de 21.08.1980,

P. 16534, *at* http://www.planalto.gov.br/ccivil_03/Leis/L6815.htm; Brazilian

Law No. 7.565, Dec. 19, 1986, D.O.U. de 23.12.1986, P. 19567, at

http://www.planalto.gov.br/ccivil_03/Leis/L7565.htm; Brazilian Decree No.

3.720, Jan. 8, 2001, D.O. Electronico de 09.01.2001, at

http://www.planalto.gov.br/ccivil_03/decreto/2001/D3720.htm.

### 3. These Foreign Laws Are Not Inconsistent With Controlling U.S. Laws

For obvious reasons, in most foreign sovereign compulsion cases, the foreign laws at issue are contrary to those of the United States, and principles of fairness, comity, sovereignty and foreign relations lead the courts to find that the actor whose behavior is compelled by foreign law is protected from liability. In this case, of course, foreign and U.S. immigration-control and terrorism-related laws are not inconsistent, since the United States also requires airlines to examine passenger passports. This harmony between foreign and U.S. laws is hardly surprising, given the undertakings of Contracting States to the Chicago Convention, the binding standards established under that agreement and the most basic precept of all nations: self-preservation through national security and border control.

Here, Japanese, Brazilian and U.S. security and other interests are served by a finding that airlines cannot be held liable under the patent laws for their inspection of passenger passports. To the extent any balancing of interests is appropriate, the patent holder's private interest must give way to the security interests of the United States and other nations and the goal of facilitating international air navigation and commerce. Accordingly, the

doctrine of foreign sovereign compulsion provides an additional justification for affirming the District Court's dismissal of Iris' Complaint.

## CONCLUSION

For the foregoing reasons, Defendant JAL requests that the district court's judgment be affirmed.


Dated:  April 2, 2014

Respectfully submitted,


/s/ Meredith Martin Addy

| | |
|---|---|
| Meredith Martin Addy | Charles F. Schill |
| STEPTOE & JOHNSON LLP | William Karas |
| 115 South LaSalle Street | Carol Gosain |
| Suite 3100 | Paul D. Lall |
| Chicago, IL 60603 | Stephanie L. Roberts |
| 312.577.1300 | STEPTOE & JOHNSON LLP |
| | 1330 Connecticut Avenue, N.W. |
| | Washington, D.C. 20009 |
| | 202.429.3000 |


*Attorneys for Defendant-Appellee Japan Airlines International Company, Ltd.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing Corrected Brief of Defendant-Appellee were served this 2nd day of April, 2014 by CM-ECF upon all counsel of record.

April 2, 2014                                    Respectfully submitted,

                                                 /s/ Meredith Martin Addy
                                                 Meredith Martin Addy
                                                 STEPTOE & JOHNSON LLP
                                                 115 South LaSalle Street
                                                 Suite 3100
                                                 Chicago, IL 60603
                                                 312.577.1300

                                                 *Counsel for Defendant-Appellee*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B) and

32(a)(7)(C), counsel for Defendant-Appellee herein certifies that this

Corrected Appellee Brief conforms with the type-volume limitation.

According to the "Word Count" feature of Microsoft Word 2010, this

Appellee Brief contains 10,116 words, which complies with the

requirements of the above-referenced rules.


April 2, 2014                                    Respectfully submitted,


                                                 /s/ Meredith Martin Addy
                                                 Meredith Martin Addy
                                                 STEPTOE & JOHNSON LLP
                                                 115 South LaSalle Street
                                                 Suite 3100
                                                 Chicago, IL 60603
                                                 312.577.1300

                                                 *Counsel for Defendant-Appellee*